UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA M. BLANQUET,                    )<br>                                         )<br>              Plaintiff,                )<br>                                         )<br>         v.                             )<br>                                         )<br>JO ANNE BARNHART,                        )<br>Commissioner of Social                  )<br>Security,                                )<br>                                         )<br>              Defendant.                )<br>_____) | Case No. EDCV 05-479-JTL<br><br>MEMORANDUM OPINION AND ORDER |

**PROCEEDINGS**

On June 3, 2005, Rebecca Blanquet ("plaintiff") filed a Complaint seeking review of the Commissioner's denial of her application for Supplemental Security Income ("SSI") disability benefits. On August 12, 2005, the parties filed a Consent to Proceed Before United States Magistrate Judge Jennifer T. Lum. Thereafter, on December 13, 2005, defendant filed an Answer to Complaint. On February 23, 2006, the parties filed their Joint Stipulation.

The matter is now ready for decision.

///

///

///

**BACKGROUND**

On April 30, 2003,[1] plaintiff protectively filed an application for Supplemental Security Income ("SSI") disability benefits. (Administrative Record ["AR"] at 87, 88-89). Plaintiff claimed that her disability commenced on April 12, 1995. (AR at 88). She alleged that she was disabled due to a traumatic brain injury, diabetes insipidus, hypopituitarism, and astigmatism. She complained that she could not sleep and that she took a long time to complete all activities and tasks. She also alleged problems with memory. (AR at 124). The Commissioner denied plaintiff's application for benefits initially and upon reconsideration. (AR at 56-59, 61-65). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (AR at 69).

On October 14, 2004, the ALJ conducted a hearing in San Bernardino, California. (AR at 28-48). Plaintiff appeared at the hearing with her counsel and testified. (AR at 29-45). Corrine Porter, a vocational expert, also testified. (AR at 45-47).

On February 21, 2005, the ALJ issued his decision denying benefits. (AR at 12-23). In his decision, the ALJ concluded that plaintiff suffered from the following severe impairments: brain injury, pituitary tumor, hypopituitarism, memory problems, diabetes, dizziness, fatigue and vision problems. (AR at 22). But, according to the ALJ, none of these impairments, either individually or in combination, met or equaled any of the criteria contained in the Commissioner's Listing of Impairments, 20 C.F.R. Section 404, Subpart P, Appendix 1. (Id.). Next, the ALJ determined that plaintiff retained the residual functional

---

[1] Plaintiff filed a previous application on September 17, 2002, which was not appealed and not at issue. (See AR at 12; AR at 84, 85-86).

capacity to perform sedentary entry level work,[2] working with things rather than people.[3] The ALJ found that plaintiff could not work at unprotected heights, on dangerous machinery, or in extreme temperatures. (AR at 19). Ultimately, the ALJ found that plaintiff was not disabled pursuant to the Social Security Act. (AR at 22, 23).

On February 21, 2005, plaintiff timely filed a request with the Appeals Council for review of the ALJ's decision, which was denied. (AR at 5-8).

**PLAINTIFF'S CONTENTIONS**

1.  The ALJ failed to properly consider the treating physician's opinion of disability.

2.  The ALJ failed to properly consider the testimony of the lay witness.

3.  The ALJ failed to properly consider the opinion of Adam Cash, Psy.D.

4.  The ALJ failed to pose a complete hypothetical question to the vocational expert.

---

[2] In his Finding No. 5, the ALJ found that plaintiff was capable of "light work as described in the body of the decision." (AR at 22). Although the body of the decision refers to a residual functional capacity for light and for sedentary work (see AR at 19-20), it appears that the ALJ's references to light work were made in error. The ALJ stated that he found plaintiff "generally credible and finds she is limited to sedentary work only because of the fatigue factor reported and because her cognitive skills have slowed." (AR at 19). He also cited Medical-Vocational Rule 201.27 as a framework for decision-making. (AR at 21, 22). This rule is found in Table 1 of Appendix 2, Subpart P, 20 C.F.R. Part 404, and addresses "sedentary" work.

[3] "[T]he primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people)." Section 200.00(h)(4)(I), Appendix 2, Subpart P, 20 C.F.R. Part 404.

**STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence means "more than a mere scintilla" but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971); Desrosiers v. Secretary of Health & Human Servs., 846 F.2d 573, 575-76 (9th Cir. 1988).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. This Court must review the record as a whole and consider adverse as well as supporting evidence. Green v. Heckler, 803 F.2d 528, 529-30 (9th Cir. 1986). Where evidence is susceptible of more than one rational interpretation, the Commissioner's decision must be upheld. Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984).

**DISCUSSION**

**A.   THE TREATING PHYSICIAN'S OPINION**

An ALJ should give a treating physician's opinion greater weight than that of an examining physician. See Andrews v. Shalala, 53 F.3d 1035, 1040-41 (9th Cir. 1995) ("It is clear that more weight is given to a treating physician's opinion than to the opinion of a non-treating physician because a treating physician 'is employed to cure and has a greater opportunity to know and observe the patient as an individual'") (quoting Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989); see also Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987). "The treating physician's opinion is not, however, necessarily conclusive as

4

to either a physical condition or the ultimate issue of disability." Magallenes, 881 F.2d at 751, citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 and n.7 (9th Cir. 1989).  The proper weight that the ALJ should give to a treating physician's opinion depends on whether sufficient data supports the opinion and whether the opinion comports with other evidence in the record.  See 20 C.F.R. § 416.927.

Moreover, the ALJ may disregard a treating physician's opinion whether or not other medical evidence contradicts that opinion. See Andrews, 53 F.3d at 1041.  Before rejecting a treating physician's uncontroverted opinion, however, the ALJ must present clear and convincing reasons for doing so.  See Andrews, 53 F.3d at 1041; see also Montijo v. Secretary of Health & Human Services, 729 F.2d 599, 601 (9th Cir. 1984).  "Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing 'specific and legitimate reasons' supported by substantial evidence in the record for so doing."  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Furthermore, "where the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict."  Andrews, 53 F.3d at 1041.

Plaintiff's treating physician, John Mace, M.D., completed numerous questionnaires entitled "Verification of Disability" on plaintiff's behalf.  (See AR at 307, 317).  In August 2000, Dr. Mace indicated that plaintiff would need the services of readers, notetakers, a campus van, and special test taking arrangements to allow plaintiff to attend college.  (AR at 317).  In December 2002, Dr. Mace indicated that

5

plaintiff "needs more time to take tests. Her condition requires her to need twice as much time to finish a task." (AR at 307). He reiterated this opinion in a letter that he wrote for plaintiff to use as she needed "concerning [her] education:"

> You have a condition known as panhypopituitarism secondary to having a craniopharyngioma[4] and surgery and now in addition to the panhypopituitarism the condition known as hypothalamic obesity. This combination of problems will leave you with much less energy than you would have otherwise. You are likely to have great difficulty in controlling your weight and will unlikely be able to carry any full load of college."

(AR at 270).

Plaintiff contends that the ALJ did not fully discuss Dr. Mace's opinions regarding plaintiff's disability and, moreover, the ALJ failed to state whether he accepted or rejected Dr. Mace's opinions. But Dr. Mace does not conclude in his opinions that plaintiff is disabled and unable to perform any work activity. Moreover, to the extent his opinions suggested that plaintiff was subject to certain limitations, the ALJ adequately incorporated Dr. Mace's findings in his residual functional capacity assessment. Although Dr. Mace indicated that plaintiff "requires twice as much time to finish a task" (AR at 307),

---

[4] "A tumor arising from cell rests derived from the hypophysial stalk or Rathke's pouch, frequently associated with increased intracranial pressure, and showing calcium deposits in the capsule or in the tumor proper. Deficits of pituitary hormones may also occur." Dorland's Illustrated Medical Dictionary, 416 (29th ed. 2000).

6

Dr. Mace included this restriction in the context of plaintiff's ability to attend college and maintain an adequate grade point average. Accordingly, Dr. Mace recommended that plaintiff only carry half a load in college. (AR at 270).

In arriving at plaintiff's residual functional capacity assessment, the ALJ specifically noted that two consultative examiners found that plaintiff could perform medium work, while a subsequent neurological examiner[5] limited plaintiff to light work. (AR at 19; see AR at 215, 328). However, he found that plaintiff was "limited to sedentary work only because of the fatigue factor reported and because her cognitive skills have slowed." He further found that the residual functional capacity for sedentary work was "supported by the medical findings and evidentiary record." (AR at 19). Thus, the ALJ did not reject any opinion of disability expressed by Dr. Mace but took the medical findings along with plaintiff's subjective complaints into consideration in arriving at his residual functional capacity assessment. See Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995)(Clear and convincing reasons were not required when the ALJ was not discrediting the report of a treating physician but rather interpreting it.).

Next, plaintiff suggests that the ALJ erred in failing to adequately state whether he rejected or accepted Dr. Mace's diagnosis of panhypopituitarism or his opinion that plaintiff's condition is permanent. (Joint Stipulation at 4). These arguments are without

---

[5] Although the ALJ refers to a "subsequent neurological consultative examination" limiting plaintiff to light work, there is no consultative neurological examination other than that of Dr. Sarah Maze, who opined essentially that plaintiff could perform medium work. (AR at 215). It appears that the ALJ is referring to the opinion of Dr. Joel Ross, a non-examining State Agency physician, who opined that plaintiff was limited to light work. (AR at 17; AR at 225-32).

7

merit. The very source from which plaintiff obtained her definition of hypopituitarism, www.medicinenet.com, makes no distinction between panhypopituitarism and hypopituitarism, which was one of the medically determinable impairments found by the ALJ. (AR at 22; see also AR at 98). Moreover, no one doubts that plaintiff's condition is permanent, but the fact that it is permanent does not result in any greater limitations than as found by the ALJ.

**B.    LAY WITNESS TESTIMONY**

20 C.F.R. § 416.913(d) provides that the Commissioner may use evidence from sources such as parents and friends to show the severity of an individual's impairment and how it affects the individual's ability to work. Plaintiff cites, inter alia, Sprague, 812 F.2d at 1232, "for the proposition that 'descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated as competent evidence.'" (Joint Stipulation at 9). Such evidence can only be rejected if the ALJ gives reasons germane to each witness. Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). Plaintiff contends that the ALJ failed properly to consider the Third Party Questionnaire completed on June 17, 2003, by her friend, Erika Capalla. (Joint Stipulation at 8).

At the outset, there is a question whether Ms. Capalla's statement even qualifies as competent evidence from someone "in a position to observe" plaintiff's symptoms and daily activities. Ms. Capalla only saw plaintiff five hours a week at the library studying or visiting friends. (AR at 141).

Even assuming, however, that Ms. Capalla's statement is considered competent evidence or "testimony," plaintiff's argument must be rejected. Ms. Capalla's Third Party Questionnaire is found at Exhibit

8

8E.  (AR at 141-49). Although the ALJ mistakenly attributed this statement to plaintiff's mother, the ALJ specifically stated that he "read and considered the claimant's activities of daily living as reported . . . in Exhibits 3E and 8E."  (AR at 19).

The ALJ did not reject Ms. Capalla's statements.  Rather, he found that the recitation of plaintiff's daily activities as reported by plaintiff herself, by her mother, and by Ms. Capalla, and as evidenced in Exhibit 8E, indicated that on an average day, "the claimant arises early, grooms herself, has breakfast, and is driven to school where she attends classes and studies until late in the afternoon.  Upon arriving home, the claimant does coursework, has dinner, and studies, reads, or does homework until the early hours of the morning.  Her mother prepares her meals and the claimant is not asked to help around the house.  The claimant manages her own funds and does personal shopping as time allows.  Outside activities include church services and one school organization meeting weekly while weekends are spent resting or doing schoolwork."  (AR at 19).

Plaintiff, however, cites Ms. Capalla statements that plaintiff's condition affects her sleep,[6] that plaintiff needs assistance in dressing, bathing, and brushing her hair, that plaintiff needs reminders to take her medication, that plaintiff cannot do housework because of her lack of strength, that plaintiff cannot handle money because she is easily confused, and that she has difficulty with multiple physical and mental activities (Joint Stipulation at 8-9, <u>citing</u> AR 142-46). However, Ms. Capalla also indicates that notwithstanding these asserted difficulties, when plaintiff "wakes up, she goes to school for around 10

---

[6] The sleep problem is due to lack of time.  (AR at 142).

hours . . .;" she "shops with her mom and shops for clothes, school supplies, shoes, and personal items" "whenever she needs them;" "she visits friends when her friend picks her up;" and "that she goes to church on Sundays and school Monday through Friday." (AR at 141, 144, 145). To the extent that Ms. Capalla's statement contains ambiguities, it is for the ALJ to resolve, Magallanes, 881 F.2d at 750 (9th Cir. 1989)("The ALJ is likewise responsible for resolving ambiguities"), and the ALJ was within his prerogative to rely upon Ms. Capalla's statements concerning the extent of plaintiff's activities.

Moreover, plaintiff's mother contradicted much of Ms. Capalla's assessment relating to plaintiff's claimed limitations. Plaintiff's mother lived with plaintiff and observed her for more than the five hours a week that Ms. Capalla saw her. (AR at 141). (Joint Stipulation at 11). Unlike Ms. Capalla, plaintiff's mother indicated that plaintiff had no problems sleeping (AR at 108), that she had no problems with personal grooming, except brushing her hair to cover her surgical scar (AR at 108), that plaintiff managed her own money "with a little supervision" from her mother (AR at 109), and that plaintiff did not do any chores because she did not have chores to do (Id.). In considering the nature of plaintiff's activities and the time she devoted to them, as reflected in plaintiff's own statements of plaintiff and witnesses' statements, the ALJ correctly observed her activities were inconsistent with an impairment of "debilitating magnitude." (AR at 20). Instead, the conclusion is more likely that plaintiff cannot undertake both her schooling and full-time employment at the same time. Plaintiff's mother succinctly summed up plaintiff's problem:

> Rebecca cannot work and go to school at the same time. She would fail her courses, lose her

|   |   |
|---|---|
| 1 | scholarship, and would not finish her education. |
| 2 | She needs monetary help buying her medications and |
| 3 | personal products. |

(AR at 112).

In sum, the ALJ did not err in his failure to specifically address the statement of Erika Capalla.

**C.    THE OPINION OF ADAM CASH, PSY.D.**

An examining physician's report constitutes "persuasive evidence" of a plaintiff's alleged disability and inability to engage in substantial gainful activity. Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984) ("The reports of the physicians who did examine claimant, which were submitted relative to Gallant's work-related ability, are persuasive evidence of claimant's disability due to pain and his inability to engage in any form of gainful activity."). The proper weight that the ALJ should give to an examining physician's opinion depends on whether sufficient data supports the opinion and whether the opinion comports with other evidence in the record. See 20 C.F.R. § 416.927.

An ALJ is not bound by an examining medical expert's opinion, and he may reject or discredit such an opinion. Gallant, 753 F.2d at 1454. But where no evidence contradicts the examining physician's opinion, the ALJ must provide "clear and convincing" reasons to reject the opinion. Lester, 81 F.3d at 830 ("As is the case with the opinion of a treating physician, the Commissioner must provide 'clear and convincing' reasons for rejecting the uncontradicted opinion of an examining physician."). Even if medical evidence in the record contradicts the examining physician's opinion, the ALJ must still provide "specific and legitimate" reasons to reject his opinion. Id., at 830-31; see also

11

1  Andrews, 53 F.3d at 1042 ("Here, there is legitimate conflicting
2  testimony by Dr. Green and Andrews, and the ALJ gave specific reasons
3  for disregarding the conflicting observations, opinions and conclusions
4  of McConochie."). Furthermore, the ALJ possesses the sole discretion to
5  resolve conflicts between conflicting medical evidence. Andrews, 53
6  F.3d at 1041 ("Where the opinion of the claimant's treating physician is
7  contradicted, and the opinion of a nontreating source is based on
8  independent clinical findings that differ from those of the treating
9  physician, the opinion may itself be substantial evidence; it is then
10 solely the province of the ALJ to resolve the conflict.").

11     Plaintiff underwent a consultative examination with Adam Cash,
12 Psy.D. on November 27, 2002.  Dr. Cash opined, inter alia, that
13 plaintiff had "mild to moderate difficulties with concentration, pace,
14 and persistence. She may have moderate difficulties interacting with a
15 supervisor and coworkers as a result of her irritability and anger
16 difficulties." (Emphasis added.) (AR at 201). Plaintiff contends that
17 "the matter must be remanded in order for the ALJ to explain whether he
18 accepts or rejects Dr. Cash's opinion of disability." (Joint Stipulation
19 at 13).

20     What plaintiff fails to acknowledge, however, is that in addition
21 to Dr. Cash's consultative report, there is a subsequent report by
22 Clifford Taylor, Ph.D., dated September 28, 2004. The ALJ specifically
23 indicated in his decision that with regard to plaintiff's allegations of
24 a mental impairment, he "adopts the findings of Dr. Taylor at Exhibit
25 24. The claimant's cognitive skills have slowed secondary to physical
26 problems; however, the claimant attends a university, is majoring in
27 mathematics, works one day a week and takes care of her own personal
28 needs." (AR at 20).

Dr. Taylor indicated that plaintiff had no diagnosis or condition on Axis I. (AR at 337). He also found that plaintiff was slightly impaired in her ability to interact with the public, supervisors, and co-workers. (AR at 340). A slight impairment is mild limitation in the area, "but the individual can generally function well." (AR at 339). Moreover, Dr. Cash and Dr. Taylor are both examining physicians. As such, neither is entitled, by virtue of their status, to more deference than the other. Because Dr. Taylor's assessment is based upon his own independent clinical findings, it is for the ALJ to resolve the conflict. Andrews, 53 F.3d at 1041. Plaintiff offers no argument why Dr. Cash's assessment should be entitled to greater weight than the opinion of Dr. Taylor. Therefore, the ALJ did not err when he decided to rely on Dr. Taylor's findings.

**D.    THE HYPOTHETICAL QUESTION POSED TO THE VOCATIONAL EXPERT**

Once plaintiff has established that she cannot return to her past relevant work, or, as here, there is no past relevant work, the burden shifts to the Commissioner to show that there is other substantial work which plaintiff can perform. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). The Commissioner can meet this burden in two ways. The first is by calling upon a vocational expert to testify as to what jobs plaintiff can still perform given her residual functional capacity and the availability of such jobs in the national economy. The second way is by relying upon the Medical-Vocational Guidelines ("grids") in Appendix 2, Subpart P, 20 C.F.R. Part 404. Tackett v. Apfel, 180 F.3d 1094, 1101 (9th Cir. 1999).

The grids are "a short-hand method for determining the availability and numbers of suitable jobs for a claimant. . . . The grids categorize jobs by their physical-exertional requirements and consist of three

tables," one for sedentary work, one for light, and one for medium. "Each grid presents various combinations of factors relevant to a claimant's ability to find work. The factors in the grids are the claimant's age, education, and work experience. For each combination of these factors, e.g., fifty years old, limited education, and unskilled work experience, the grids direct a finding of either 'disabled' or 'not disabled' based on the number of jobs in the national economy in that category. . . .". Tackett, 180 F.3d at 1101.

However, "[w]hen they do not adequately take into account claimant's abilities and limitations, the Grids are to be used only as a framework, and a vocational expert must be consulted." Thomas v. Barnhart, 278 F.3d at 960, citing Moore v. Apfel, 216 F.3d 864, 869-70 (9th Cir. 2000).

Here, the ALJ sought the expertise of a vocational expert. Plaintiff complains that the ALJ did not incorporate into any of his hypotheticals plaintiff's difficulties with irritability and anger as discussed by Dr. Cash. (See, e.g., AR at 198, 213). However, the ALJ is required to include only those restrictions in his hypothetical that he legitimately found to exist and that are supported by substantial evidence in the record. Osenbrock v. Apfel, 240 F.3d 1157, 1165 (9th Cir. 2001)("It is, however, proper for an ALJ to limit a hypothetical to those impairments that are supported by substantial evidence in the record."). The ALJ did not find that plaintiff had significant limitations in interacting with supervisors and coworkers, and even Dr. Cash was not clear that such limitations were necessary. Dr. Cash opined only that plaintiff "'may have moderate difficulties with a supervisor and co-workers as a result of her irritability and anger difficulties.'" (Joint Stipulation at 15; see AR at 201). Moreover,

despite plaintiff's allegations of irritability, plaintiff herself indicated generally that she got along well with others (AR at 116) and her episodes of anger and irritation may have been limited to interaction with her family. (See AR at 213). Plaintiff's friend, Erika Capalla, indicated that plaintiff had problems getting along with others, but only when she had headaches due to heat. (AR at 145; see AR at 153). Even so, Ms. Capalla reported that plaintiff generally got along with authority figures, although "some teachers feels [sic] she is more trouble." (AR at 146). The ALJ's failure to find any significant limitations based upon plaintiff's irritability and his corresponding decision not to include any such limitations in his hypothetical question to the vocational expert is, therefore, supported by substantial evidence.

**ORDER**

After careful consideration of all documents filed in this matter, this Court finds that the decision of the Commissioner is supported by substantial evidence and the Commissioner applied the proper legal standards. The Court, therefore, AFFIRMS the decision of the Commissioner of Social Security Administration.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: June 29, 2006

                                          /s/
                                  JENNIFER T. LUM
                                  UNITED STATES MAGISTRATE JUDGE